# IN THE COURT OF APPEALS OF IOWA

————————————

No. 25-0603
Filed April 15, 2026

————————————

**State of Iowa,**
Plaintiff–Appellee,
v.
**Calvin Orlando Hoskins,**
Defendant–Appellant.

————————————

Appeal from Iowa District Court for Black Hawk County,
The Honorable Joel Dalrymple, Judge.

————————————

**REVERSED AND REMANDED**

————————————

Martha J. Lucey, State Appellate Defender, and Josh Irwin, Assistant
Appellate Defender, attorneys for appellant.

Brenna Bird, Attorney General, and Joseph D. Ferrentino, Assistant
Attorney General, attorneys for appellee.

————————————

Considered without oral argument
by Tabor, C.J., and Badding and Sandy, JJ.
Opinion by Sandy, J. Dissent by Badding, J.

**SANDY, Judge.**

Seeing is believing.[1] In *State v. Harbach*, our supreme court cautioned that while body-camera footage can be useful, courts should exercise care when relying on video to resolve factual questions not easily observable. 3 N.W.3d 209, 222 (Iowa 2024). That caution, however, does not permit courts to discount video evidence when it directly captures the conduct at issue. Although video is often just "one factor to consider" in suppression rulings, *State v. Mohr*, No. 19-0070, 2020 WL 564907, at *2 (Iowa Ct. App. Feb. 5, 2020), recordings that depict with clarity the precise moments under review are particularly probative especially when they directly contradict officer testimony. *See State v. Ripperger*, No. 14-2108, 2016 WL 146525, at *2 (Iowa Ct. App. Jan. 13, 2016).

Following a conditional guilty plea to drug charges, Calvin Hoskins appeals the district court's denial of his motion to suppress a baggie of methamphetamine seized from his person without a warrant. Here, the videos show no object protruding from Calvin Hoskins's waistband until after the officer lifted his clothing. Because the State failed to establish that the seizure fell within the narrow confines of the plain-view exception, we reverse and remand for further proceedings.

## BACKGROUND FACTS & PROCEDURE

Shortly before 2:00 a.m. on October 5, 2024, Waterloo police officers were conducting a traffic stop in Black Hawk County. Officer Gustavo

---

[1] "*Segnius irritant animos demissa per aurem quam quae sunt oculis subiecta fidelibus.*" *See* Horace, *Ars Poetica* ll. 180–81 (c. 19 BC). This quotation is commonly translated as, "The mind is stirred less vividly by what's heard Than by what the eyes reliably report," *see* Horace, *Ars Poetica* ll. 180–81 (A.S. Kline trans., 2005), or more colloquially stated in the famous Chinese proverb, "I would rather see once than hear a hundred times."

Gasca-Muniz had activated emergency lights on his vehicle and was outside attending to that stop. Officer Dallas Blackburn arrived to assist. As Blackburn prepared to exit his patrol vehicle, a GMC sport-utility vehicle drove past the scene without moving over. Blackburn observed the vehicle pass close to Gasca-Muniz and initiated a traffic stop.

The GMC was driven by Hoskins, who was the sole occupant. Prior to his shift starting Blackburn had been briefed through intelligence reports that Hoskins was someone to "be on the lookout for" based on his prior criminal history (i.e. drugs). Blackburn obtained Hoskins driver's license—confirming his identity for the first time—and insurance information. While Blackburn spoke with Hoskins from the driver's side, Gasca-Muniz approached the passenger side of the vehicle. Gasca-Muniz advised Blackburn there was a bottle of tequila in the back seat.

Blackburn asked Hoskins to exit the vehicle. Body-camera and squad-car footage admitted into evidence shows Hoskins stepping out while wearing a long sweatshirt that extended below his waistband over his pant pockets. At that point, neither video angles show any object protruding from Hoskins's clothing. As Hoskins stood next to the vehicle, Blackburn immediately asked, "What's in your pocket right here?" while gesturing toward Hoskins's midsection. Hoskins moved his hands toward his waist, and both officers instructed him not to reach. Blackburn then grasped Hoskins's sweatshirt and undershirt and lifted them upward. Only after that movement does the video show a plastic bag visible near Hoskins's waistband.

The officers restrained Hoskins's arms. Blackburn removed a gallon sized plastic bag from Hoskins's waistband. The bag contained a crystalline

substance, later determined to be methamphetamine, weighing more than seven grams.

Hoskins was arrested. Officers subsequently searched the vehicle and located the bottle of tequila in the back seat. Hoskins was charged with possession of more than five grams of methamphetamine with intent to deliver, second or subsequent offense, in violation of Iowa Code sections 124.401(1)(b)(7) (2024) and 124.411, and failure to affix a drug tax stamp, in violation of Iowa Code section 453B.12(2).

Hoskins filed a motion to suppress, asserting the seizure of the bag violated the Fourth Amendment of the United States Constitution and article I, section 8 of the Iowa Constitution. He argued the plastic baggie was not in plain view and that officers discovered it only after manipulating his clothing without a warrant or an applicable exception. The district court held an evidentiary hearing on December 20, 2024. Officer Blackburn testified, and the State introduced body-camera and squad-car video recordings. Hoskins did not present evidence.

On January 27, 2025, the district court denied the motion to suppress. In relevant part, the court found that the plastic bag was in plain view. The court further concluded the incriminating nature of the "exposed" bag was immediately apparent based on its location and the officer's training and experience.

Hoskins entered conditional guilty pleas pursuant to Iowa Rule of Criminal Procedure 2.8(2)(b)(9), reserving his right to appeal the suppression ruling. The district court accepted the pleas on February 4, 2025. On April 3, 2025, the court imposed concurrent sentences, including

an indeterminate term not to exceed twenty-five years for possession with intent to deliver. Hoskins timely appeals.

## STANDARD OF REVIEW

Because Hoskins raises a constitutional challenge to the denial of his suppression motion, we apply a de novo standard of review. *See State v. Hunt*, 974 N.W.2d 493, 496 (Iowa 2022). Under that standard, we independently evaluate his claims in light of the totality of the circumstances and the entire record. *Id.* We give some weight to the district court's factual findings due to its opportunity to assess witness credibility, while remaining free to reach our own conclusions. *Id.*

## DISCUSSION

The Fourth Amendment of the United States Constitution and article I, section 8 of the Iowa Constitution safeguard individuals against unreasonable searches and seizures. A warrantless search is therefore "per se unreasonable" unless it falls within a recognized exception to the warrant requirement. *State v. McGrane*, 733 N.W.2d 671, 676 (Iowa 2007). The State invokes the plain-view exception here.

To rely on that exception, the State must establish—by a preponderance of the evidence—that the seized item was in plain view, the officers were lawfully present when they observed it, and the item's incriminating nature was immediately apparent. *Id.* at 680 (quoting *Horton v. California,* 496 U.S. 128, 136 (1990)); *see also Hunt*, 974 N.W.2d at 497. Hoskins disputes the first and third of these requirements.

## I.    Plain View

On the first requirement, Hoskins maintains the baggie of methamphetamine was not in plain view. Pointing to the body-camera and squad-car footage, he argues the baggie did not become visible until after officers physically lifted his sweatshirt and t-shirt.

Video evidence is advantageous in that it allows appellate judges to put themselves in the same position as the trial judge when viewing it. Thus, credibility determinations of witnesses on video carry less import. *See State v. Akers*, No. 17-0577, 2018 WL 1182616, at *3–4 (Iowa Ct. App. Mar. 7, 2018) (disagreeing with the district court's assessment of video exhibit). Here, the video evidence plainly undermines key aspects of Blackburn's testimony. In this limited context, what the footage shows cannot be disregarded merely because Blackburn's testimony, standing alone, could be read to support the district court's ruling.

Here the video "speak[s] for itself." *Scott v. Harris*, 550 U.S. 372, 378 n.5 (2007); *see also State v. Despenas*, No. 21-1775, 2023 WL 2396460, at *3 (Iowa Ct. App. Mar. 8, 2023). It is our supreme court who—when first examining pre-textual traffic stops in *State v. Brown*, 930 N.W.2d 840, 849 (Iowa 2019)—pointed to technology like body cameras to someday serve as safeguards that will work to protect the constitutional rights of Iowans. Here, it does just that.

Hoskins's sweatshirt and undershirt covered his waistband when he exited the vehicle. The video evidence shows this. The video evidence also shows him stepping out without bending, twisting, or making any movement that would have exposed his waistband. Although Blackburn's body camera briefly shifts away, the dashboard camera continues to capture Hoskins's

movements and does not corroborate any change in his positioning that would have revealed an object near his waist.

To ignore pretext is to ignore context. And context is a sister to credibility. *Cf.* Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 3.2(b) (6th ed. 2025) (noting that stripping an encounter of its real-world context in favor of a purely abstract, objective reconstruction risks disregarding the officer's actual perceptions and undermines meaningful credibility assessment). While we generally do not consider an officer's subjective motivations when assessing the legality of an otherwise lawful search, *see State v. Hoskins*, 711 N.W.2d 720, 726 (Iowa 2006), we cannot ignore context about the officer's predisposition when assessing why his testimony regarding his actions are in direct contradiction to the video evidence. Blackburn testified that he asked Hoskins to exit the vehicle because he suspected Hoskins was driving while intoxicated based on a bottle of liquor in the back seat. But Blackburn did not ask Hoskins whether he had been drinking, did not report smelling alcohol, and the video does not reveal slurred speech or other indicia of impairment. No field sobriety tests were administered. No blood or urine samples were requested. Most importantly, Blackburn testified that immediately before his shift started, he was briefed by fellow officers (through intelligence reports) that Hoskins was someone to "be on the lookout for" based on his drug history. That knowledge provides important context which undermines the asserted justification for escalating the encounter.[2]

We do not speculate as to Blackburn's motivations. But this context explains the rapid escalation of the encounter and informs our conclusion,

---

[2] Blackburn later recorded in the arrest information section of his own report that Hoskins was sober.

supported by the video, that the officer short-circuited constitutional safeguards once he identified Hoskins as someone with a prior drug history who presented a perceived opportunity for an immediate narcotics seizure. *See* Orin S. Kerr, *An Equilibrium-Adjustment Theory of the Fourth Amendment*, 125 Harv. L. Rev. 476, 491–92, 517 (2011) (explaining that courts should assess what police did and how an encounter escalated, without speculating about an officer's subjective intent). Contemporaneous with Hoskins exiting the vehicle, the officer points to Hoskins's waistband, and lifts his clothing to gain access to his waistband. During this exchange, Blackburn's body camera again points away from Hoskins for a very brief moment, which the dissent cites as a moment of uncertainty weighing in favor of the officer's testimony. But given the positioning of Hoskins's sweatshirt and undershirt—as reflected on the video—there is no possibility of a baggie protruding out from Hoskins's clothing (and certainly not "four inches" as testified to by Blackburn). The squad-car video likewise shows Hoskins's sweatshirt and undershirt continuing to cover his waistband providing no visual support for Blackburn's account. There is no plain view. Although no Iowa court has articulated the point as directly, the Florida Supreme Court has expressed it with particular clarity.

> We respect the authority and expertise of law enforcement officers, and thus rely on an officer's memory when necessary. But we would be remiss if we failed to acknowledge that at times, an officer's human recollection and report may be contrary to that which actually happened as evinced in the real time video. This is the reality of human imperfection; we cannot expect officers to retain information as if he or she were a computer. Therefore, a judge who has the benefit of reviewing objective and neutral video evidence along with officer testimony cannot be expected to ignore that video evidence simply because it totally contradicts the officer's recollection. Such a standard would produce an absurd result.

*Wiggins v. Fla. Dep't. of Hwy. Safety & Motor Vehicles*, 209 So. 3d 1165, 1172 (Fla. 2017). Here, too much credence to the testimony of Blackburn in the face of direct contradictory video evidence occurred. Blackburn may have been well-intentioned. However, good intentions do not give way to the constitutional rights of the citizenry.

If Blackburn had reasonably believed that Hoskins was potentially armed and dangerous, he could have performed a lawful pat-down under *Terry v. Ohio*, 392 U.S. 1, 30 (1968), and the incriminating nature of the bag likely would have become immediately apparent in the process.

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable [people] draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.

*State v. Short*, 851 N.W.2d 474, 502 (Iowa 2014) (quoting *Johnson v. United States*, 333 U.S. 10, 14 (1948)).

While video evidence is not always dispositive, it cannot be discounted when it squarely addresses the factual question presented. Unlike cases where footage is inconclusive or fails to capture the relevant moment, the videos here depict the precise circumstances surrounding Hoskins's exit from the vehicle. From what the cameras show, Hoskins's sweatshirt and undershirt remain well over his waistband, and no object is visibly protruding from it. When video evidence contradicts an officer's description of what occurred, we are not at liberty to disregard that evidence in favor of officer testimony alone. *See Ripperger*, 2016 WL 14625880, at *2. Although our supreme court in *Harbach*, 3 N.W.3d at 222, cautions courts against overreliance on video for facts not easily observable, the presence or absence

of a visibly protruding gallon-sized storage baggie is a matter well within the capacity of the cameras here. In these circumstances the footage is not merely one factor among many but the most reliable evidence of what occurred. There was no baggie in plain view, and this search does not meet the narrow exceptions to warrantless searches granted to law enforcement officers in the constitutions of the United States or the State of Iowa.

## II.    Immediately Apparent

Even setting aside our conclusion that the baggie was not in plain view, the State also fails on the "immediately apparent" prong. That element demands probable cause at the moment of observation. This means facts sufficient for a person of reasonable prudence to believe the object is contraband or evidence of a crime. *State v. Kern*, 831 N.W.2d 149, 174 (Iowa 2013); *State v. Naujoks*, 637 N.W.2d 101, 108 (Iowa 2001). "Immediately apparent" is not a talismanic phrase that relaxes the constitutional threshold. It is simply the familiar probable-cause standard applied to what the officer claims to see. *Texas v. Brown*, 460 U.S. 730, 741–42 (1983) (explaining the phrase is "an unhappy choice of words," and that the showing is a "'practical, nontechnical' probability").

The State's argument—consistent with Blackburn's testimony—did not rest on an observation of a large bulge in Hoskins's clothing, nor on the tactile confirmation of such a bulge during a lawful *Terry* frisk. *See, e.g. State v. Kilpatrick*, No. 17-0817, 208 WL 3060259, at *3 (Iowa Ct. App. Jun. 20, 2018). Instead, the State premised probable cause on the alleged visual observation of the plastic bag itself. Had the testimony established the observation of an unidentified bulge, followed by lawful tactile perception revealing potential for its incriminating character, the claim that its nature was "immediately apparent" would be more persuasive. However, that is not

the argument the State makes nor is it the observation to which Blackburn testified. Rather, State contends that Blackburn's alleged observance of "four to five inches" of the gallon plastic bag protruding from Hoskins's waistband is "immediately apparent". But for reasons sufficiently articulated above, we reject that Blackburn observed the plastic bag. Nothing in the record indicates otherwise.

## CONCLUSION

As the videos reflect, no plastic protrusion was visible when Hoskins exited the SUV. It appeared *only* after the officer lifted Hoskins's sweatshirt and undershirt. That is not plain view. This is a search. *See Minnesota v. Dickerson*, 508 U.S. 366, 379 (1993) (manipulating an object to gain a better view or feel constitutes a search that must be supported by probable cause independent of what is thereby revealed). The law does not allow an officer to create the "view" and manufacture probable cause with what the manipulation exposes, and then retroactively invoke plain view's "immediately apparent" prong. The doctrine cannot bootstrap itself.

The sequence matters. Probable cause must precede the intrusion that reveals the incriminating detail. It may not be the product of that intrusion. *Id*. The videos show that the incriminating inference, a gallon-sized bag containing methamphetamine, became possible only after the officer lifted two layers of clothing. Allowing the government to justify the seizure by what the manipulation uncovered would invert the Fourth Amendment, permitting officers to create the very "plain view" they use to justify their behavior. Where an officer's search itself violates the Fourth Amendment, the presence of probable cause resulting from that search does not validate its seizure. *See Soldal v. Cook Cnty.*, 506 U.S. 56, 65 (1992). Our Constitution demands more.

Because the State did not prove that the incriminating nature of the item was immediately apparent before any search occurred, the plain-view exception does not apply. The seizure violated the Fourth Amendment and article I, section 8 of the Iowa Constitution. Accordingly, we reverse the denial of the motion to suppress and remand for further proceedings.

**REVERSED AND REMANDED.**

Tabor, C.J., concurs; Badding, J., dissents.

**BADDING, Judge** (dissenting).

Because I would heed our supreme court's warning in *State v. Harbach*—that while "bodycam footage can be useful, courts should be careful in relying on the footage when determining specific facts that are not easily observable from the video"—I respectfully dissent from the majority's reversal of the district court's suppression ruling. 3 N.W.3d 209, 222 (Iowa 2024).

Video evidence is just "one factor to evaluate" when ruling on a suppression motion. *State v. Mohr*, No. 19-0070, 2020 WL 564907, at *2 (Iowa Ct. App. Feb. 5, 2020). And here, the videos of the traffic stop are not conclusive. Giving deference to the district court's implicit credibility findings, I would conclude that the court correctly found the evidence was seized under the plain view exception to the warrant requirement.

\*\*\*

Sometimes a video can "speak for itself." *Scott v. Harris*, 550 U.S. 372, 378 n.5 (2007); *see also State v. Despenas*, No. 21-1775, 2023 WL 2396460, at *3 (Iowa Ct. App. Mar. 8, 2023). That's not true here. Unlike cases where our court has reversed the denial of suppression motions based on contradictory video evidence,[3] the footage in this record neither conflicts with nor confirms Officer Dallas Blackburn's testimony about what he saw in Hoskins's waistband when Hoskins stepped out of his vehicle.

---

[3] Those cases include *State v. Akers*, No. 17-0577, 2018 WL 1182616, at *3 (Iowa Ct. App. Mar. 7, 2018), *State v. Ripperger*, No. 14-2108, 2016 WL 146525, at *2 (Iowa Ct. App. Jan. 13, 2016), and *State v. Wilkerson*, No. 11-1522, 2012 WL 2819369, at *1–3 (Iowa Ct. App. July 11, 2012).

Hoskins contends the videos from Officer Blackburn's bodycam and squad car show that his sweatshirt was covering his waistband when he stepped out of the car. The majority agrees, finding that Hoskins was "wearing a long sweatshirt that extended below his waistband over his pant pockets"[4] and that neither the bodycam nor dashcam footage "show any object protruding from Hoskins's clothing." But as Hoskins leans forward and turns to get out, Blackburn's bodycam shifts away from him. As a result, Hoskins is out of view as he exits the car. (*See* Figure 1). Just a few seconds later, the officer shines his flashlight at Hoskins's waist and asks, "What's in your pocket right here?" During this exchange, Blackburn's bodycam is again directed away from Hoskins. Hoskins, however, argues that he is "visible for the entire encounter, albeit from a further distance, in the car-camera footage, as is Blackburn grabbing his shirt and raising it from Hoskins's waistband after asking what is in his pocket."



*Figure 1 – Blackburn's bodycam as Hoskins exits the vehicle.*

The dashcam video does show a full view of Blackburn and Hoskins—but at such a distance that it's impossible to tell whether the baggie was

---

[4] It doesn't appear from my review of the videos that Hoskins's sweatshirt is particularly long. Nor does it appear to fully cover his pants pockets. These viewing differences underscore the problem with relying solely on video evidence.

visible in Hoskins's waistband before Blackburn removed it. The view is also compromised by the glare from the squad car's headlights, which are so strong that they wash out the color of Hoskins's bright-red sweatshirt. (*See* Figure 2).



*Figure 2 – Blackburn's dashcam as Hoskins exits the vehicle.*

Given these gaps in the videos, I agree with the State that the footage is not "the be-all, end-all of the evidence." *See, e.g.*, *State v. Harriman*, 737 N.W.2d 318, 320 (Iowa 2007) (relying on an officer's testimony at a suppression hearing where the dashcam video was inconclusive). Indeed, our court has recognized that "an officer using his naked eye may well be in a better position than we are" to evaluate what's happening on the scene. *Despenas*, 2023 WL 2396460, at *4 (cleaned up). And other courts have repeatedly warned against confusing bodycam footage with the vision of the camera-wearer. *See United States v. Stuckey*, No. 24-CR-2017, 2025 WL 34816, at *2 (N.D. Iowa Jan. 6, 2025) (explaining "the body camera is positioned on [an officer's] torso, and thus does not capture what [the officer]

15

could see from an eye-level angle"); *Bitter v. Commonwealth*, 701 S.W.3d 447, 453 (Ky. 2024) ("[B]ody camera footage can be a poor substitute for trained human eyes, especially when it comes to recognizing details in a fluid situation where the camera's perspective is not synchronous to the eyes of the officer wearing it and lighting comes into play."); *United States v. Rowson*, 652 F. Supp. 3d 436, 444 (S.D.N.Y. 2023) ("[B]ody camera footage sometimes does not pick up nuances visible to the naked eye, including based on the different distances and angles involved, and that the camera may not have focused on the same, precise part of a suspect's anatomy as did the officers."); *United States v. Gray*, No. 20-191, 2021 WL 2209462, at *2 (D.D.C. 2021) ("Because the body-worn cameras focus only straight ahead and are lower than the officers' sight-line, the camera does not capture everything that each officer sees.").

Given the inherent limitations of videos from the officer's bodycam and squad car, we must resist being "inappropriately tempted" to assess plain view based on "a frame-by-frame, instant replay-type analysis." *United States v. Porter,* 170 F.4th 381, 389 (5th Cir. 2026) (explaining where "video evidence is ambiguous at best . . . , no such consideration applies"). Instead, we should defer to the district court's determination that Officer Blackburn saw what he claims he did. *See id.* (finding "no reason to depart from the district court's sound determination" that an officer was credible where the body camera footage did not "plainly contradict[]" that finding).

The majority discounts that deference, in part because of "context about the officer's predisposition" to "short-circuit[] constitutional safeguards once he identified Hoskins as someone with a prior drug history who presented a perceived opportunity for an immediate narcotics seizure." There are two problems with this conclusion. First—as the majority

16

recognizes—an officer's "subjective motivations for conducting the search are irrelevant." *State v. Scullark*, 23 N.W.3d 49, 54 (Iowa 2025). Instead, we "assess the officers' conduct using an objective standard" when determining whether an exception to the warrant requirement applies. *Id.* Second, the factual basis for the majority's conclusion is not supported by the record. Officer Blackburn did not receive a briefing about Hoskins on the same day as the stop. Instead, he testified that "it was within the [past] month" or so. And he did not seem to remember Hoskins's name from that briefing during the traffic stop. After arresting Hoskins, Officer Blackburn's bodycam captures him telling the other officer that Hoskins's name simply sounded familiar. I accordingly disagree that there was any pretext here—although even if there was, it would not be relevant to the analysis.

Turning to the other evidence in the record, the State argues the baggie must have been visible when Hoskins stepped out of the car because Officer Blackburn almost immediately asked what was in his pocket. The State contends this "would be an exceedingly strange question to ask . . . if Blackburn had not seen something." Hoskins, however, argues the question suggests that Blackburn "saw something he could not identify." In his view, "Blackburn saw a bulge, and wanted to see more. That is not plain view."[5]

In making this argument, Hoskins contends the officer's "testimony was riddled with inconsistencies which undermine his credibility." Those inconsistencies, according to Hoskins, include: Blackburn's testimony that Hoskins drove past them at a "regular rate of speed" when his police report said that Hoskins was traveling at a "high rate of speed"; his testimony that

---

[5] Hoskins also notes that the baggie "was not in [his] pocket; it was in his waistband." When asked about this at the suppression hearing, the officer testified that he "misspoke"—"it wasn't in his pocket. It was in his pants."

the other officer told him there was "an open alcoholic beverage container" in the back of the car when that officer did not say the word "open"; failing to note in his report that he asked Hoskins to get out of his car because he was concerned that Hoskins was intoxicated; omitting the size of the baggie that he saw sticking out of Hoskins's waistband from his report; and claiming that even though he was certain the baggie contained narcotics, he "was not going to retrieve it" until Hoskins reached for it.

The State claims that Hoskins is "mak[ing] mountains out of molehills" with these complaints. I agree. The cited inconsistencies are minor and immaterial to the question before us—whether Blackburn saw the baggie in plain view. *See State v. Mussehl*, No. 03-1989, 2005 WL 1105249, at *3 (Iowa Ct. App. May 11, 2005) (affirming the denial of a motion for a new trial where, "assuming credibility is an issue, the contents of the videotape do not impugn the credibility of the law enforcement officers on any material aspects of their testimony"). The district court found that he did, writing: "Upon having Hoskins step from the vehicle, Blackburn immediately observed approximately four to five inches of an apparent gallon Ziploc baggie protruding from the waistband of Hoskins." With inconclusive video evidence, I would defer to the court's credibility finding on a de novo review of the record. *See Mohr*, 2020 WL 564907, at *2. In doing so, I note that the other officer at the scene also saw the baggie before Blackburn lifted Hoskins's clothing. As they were leading Hoskins back to the squad car after his arrest, that officer told him, "You had that plastic baggie hanging out of your pocket, then you started reaching for it." Under this record, I agree with the court that the baggie of methamphetamine was in plain view.

***

I also part ways with the majority on the "immediately apparent" prong of the exception, which is assessed under our familiar probable-cause standard. *Arizona v. Hicks*, 480 U.S. 321, 326 (1987); *see also Texas v. Brown*, 460 U.S. 730, 738 (1983) (noting that the "seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity" (citation omitted)).

Hoskins argues that the "presence of a plastic baggie does not necessarily give rise to probable cause." While that may be true, probable cause "does not require absolute certainty, but a probable determination through the eye of a reasonably prudent person." *State v. Hunt*, 974 N.W.2d 493, 499 (Iowa 2022) (citation omitted). The Supreme Court emphasized this point in *Brown*, noting "that the use of the phrase 'immediately apparent' was very likely an unhappy choice of words, since it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the 'plain view' doctrine." 460 U.S. at 741. "A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required." *Id.* at 742 (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)). That probability is present here.

Officer Blackburn testified that he had training "focused towards the identifying and apprehending [of] individuals in illegal use, distribution, [and] trafficking of illegal narcotics." Although he had been a Waterloo police officer for just shy of two years, Blackburn said that he came "into contact with narcotics on a fairly regular basis," especially considering his assignment as a canine officer. *See Hunt*, 974 N.W.2d at 499 (considering an officer's

19

training and experience in assessing probable cause). According to Blackburn, most of the narcotics that he encounters are packaged in plastic bags "in a variety of sizes." Blackburn testified that when he first saw the baggie in Hoskins's waistband, he "believed it was illegal narcotics" without having to touch it. He explained: "normal people do not stuff plastic bags into their pants in that area. And also because, through my time with the Waterloo Police Department, I've had numerous dealings with people who have concealed bags of narcotics in their groin and genital region." *See State v. Carter*, 696 N.W.2d 31, 38 (Iowa 2005) ("[A] plastic baggie is a commonly used container for narcotics and when seen in an unusual setting can tip the scales in favor of probable cause for a search."). Blackburn also noted that when he asked Hoskins about the bag, Hoskins "immediately reached for it," like he was trying "to further conceal it." *See id.* (noting a defendant's evasive maneuvers in determining probable cause).

Given Blackburn's training and experience, the placement of the baggie in Hoskins's waistband, and the surrounding circumstances, I would conclude Blackburn had probable cause to believe the baggie contained a controlled substance. The necessary probability of its "incriminating character" would have been "immediately apparent" to a reasonably prudent observer.

***

For these reasons, I would find that the seizure of the baggie was lawful under the plain view doctrine, and the district court correctly denied Hoskins's motion to suppress.